# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ROXANN L. BENTHAGEN,<br><br>              Plaintiff,<br><br>      v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>              Defendant. | 2:15-CV-269-FVS<br><br>**ORDER AFFIRMING DECISION** |

**THIS MATTER** comes before the Court based upon cross motions for summary judgment. At issue is the validity of a decision denying Roxann L. Benthagen's claim for supplemental security income. Ms. Benthagen is represented by Dana C. Madsen; the Acting Commissioner by L. Jamala Edwards.

**PROCEDURAL HISTORY**

Roxann Lee Benthagen was born on January 25, 1969. (TR 78.) On February 8, 2010, she applied for Title XVI supplemental security income. 42 U.S.C. §§ 1381-1383f. The Social Security Administration denied her initial application and her request for reconsideration, whereupon she exercised her right to a hearing before an administrative law judge. On March 24, 2011, the ALJ found Ms. Benthagen suffers from a number of severe impairments (TR 19) and she is unable to perform her past relevant work. (TR 27.) However, he also

Order ~ 1

found she is able to perform jobs that exist in significant numbers in the national economy. *Id.* Thus, he ruled she is not disabled. (TR 28.)

Ms. Benthagen asked the Appeals Council to review the ALJ's unfavorable decision, and when the Appeals Council declined to do so, she challenged the decision in United States District Court. *Benthagen v. Colvin*, CV-12-420-JPH. The attorney for the Social Security Administration declined to defend the ALJ's unfavorable ruling. Instead, the SSA's attorney joined Ms. Benthagen in asking Magistrate Judge James P. Hutton to reverse the ALJ's unfavorable decision and remand the matter for further proceedings. The parties' stipulated request for remand resulted in a second administrative hearing.

The second hearing began on November 19, 2014. Both a consulting psychologist and Ms. Benthagen testified. (TR 422-30, 430-46.) At the conclusion of their testimony, the ALJ continued the hearing in order to obtain testimony from a vocational expert. (TR 446-47.) The hearing resumed on February 10, 2015. Ms. Benthagen supplemented her prior testimony, and a vocational expert testified. (TR 452-56, 456-62.) On March 20, 2015, the ALJ issued a written analysis of her allegations. At Step Two in the SSA's sequential evaluation process, 20 C.F.R. § 416.920(a)(4), the ALJ found she suffers from a number of severe impairments, *viz.*, major depressive disorder, post-traumatic stress disorder, generalized anxiety disorder, personality disorder with

Order ~ 2

dependent features, and a history of alcohol abuse. (TR 398.) As before, he found she is unable to perform any past relevant work. (TR 409.) The issue, then, is whether she is able to perform jobs that exist in significant numbers in the national economy. (TR 410.) As before, the ALJ decided such jobs exist and she "is capable of making a successful adjustment to other work." (TR 411.)

Ms. Benthagen disagrees with the ALJ's determinations. Consequently, she asked the Appeals Council to review the ALJ's new ruling. On August 18, 2015, the Council declined to do so. With that, the ALJ's 2015 ruling became the final decision of the Social Security Administration. 20 C.F.R. § 416.1484(b)(2). Ms. Benthagen commenced this action on October 1, 2015.

**STANDARD OF REVIEW**

A district court may enter "judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" *Id.* As a result, the Commissioner's decision "will be disturbed only if it is not supported by substantial evidence or it is based on legal error." *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir.1986). "Substantial evidence means more than a mere scintilla, . . . but less than a

preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.1988) (internal punctuation and citations omitted).

**BACKGROUND**

Over the years, Ms. Benthagen has been examined by mental health professionals on a number of occasions. All of them agree her ability to perform normal, day-to-day work is impaired by her psychological problems: Amy Robinson, M.S. (October 23, 2007) ("[Ms. Benthagen] will have a difficult time interacting with other people"; "[s]he may have . . . difficulties with complex instructions" (TR 276-79; 280-85)). Abigail Osborne-Elmer, M.S. (September 17, 2008) ("Ms. Benthagen's severe anxiety and depression will interfere with her ability to initiate and maintain regular employment" (TR 292-95)). W. Scott Mabee, Ph.D. (hereinafter Dr. Mabee) (November 5, 2009) ("[Ms. Benthagen] is able to perform simple, repetitive tasks"; "she can sustain concentration for short periods of time" (TR 194-99)). John Arnold, Ph.D. (hereinafter Dr. Arnold) (October 5, 2010) (Ms. Benthagen "becomes highly anxious when required to leave her home. This will interfere with her ability to arrive for work and perform on a consistent basis." (TR 307-10)). Dr. Arnold (September 2, 2011) (Ms. Benthagen's "symptoms have shown little change over the course of her evaluation at this office" (TR 570-74)). Dr. Mabee (July 31, 2012) (Ms. Benthagen experiences marked limitations with respect to her ability to

Order ~ 4

"[c]ommunicate and perform effectively in a work setting," to "[c]omplete a normal work day," and to "[m]aintain appropriate behavior in a work setting" (TR 578-84)). Kayleen Islam-Zwart, Ph.D. (hereinafter Dr. Islam-Zwart) (October 13, 2014) ("[Ms. Benthagen] is unable to work at this time and her prognosis for the future is guarded" (TR 640-47)).

The ALJ considered the psychological assessments that are listed above, but he decided they are unduly pessimistic. The ALJ provided a number of reasons for discounting the above-listed assessments. Broadly speaking, his criticisms can be grouped into five categories. In his opinion, (1) the assessments are not supported by objective data, but instead, rely heavily upon Ms. Benthagen's subjective complaints, (2) by and large, the results of her mental status exams were unremarkable, (3) some of the assessments were based upon a single examination, (4) Ms. Benthagen advised health care providers her medications effectively controlled her symptoms, and (5) two consulting experts think she is much more capable than the disputed psychological assessments indicate.

Ms. Benthagen is sharply critical of the ALJ's analysis of the psychological assessments. Take, for example, the ALJ's assertion that the assessments are not supported by adequate, objective data. Ms. Benthagen insists the record is otherwise. She notes Drs. Mabee and Arnold examined her on two occasions

Order ~ 5

each. And while, yes, they asked questions in order to assess her condition, they did not rely exclusively upon her answers. They also administered psychological tests. So, too, Dr. Islam-Zwart. Admittedly, the latter performed only one examination of Ms. Benthagen. Nevertheless, her conclusion is consistent with those of Dr. Mabee and Arnold. As a result, this is a case in which three psychologists, who performed examinations over a period of five years, agree Ms. Benthagen's ability to work is substantially impaired.

Ms. Benthagen acknowledges the severity of her symptoms can be reduced by medication. However, as she correctly notes, this is a circumstance the psychologists considered in completing their respective assessments. Dr. Mabee ("Appropriate medication management can alleviate the severity of her anxiety and depression." (TR 198)); Dr. Islam-Zwart ("She describes some benefit from the use of medication, but should continue to work with her medical provider to determine an appropriate medication regimen." (TR 647)). Despite the fact Ms. Benthagen receives relief from the medications she takes, the examining psychologists agree her ability to work is substantially impaired.

If the examining psychologists are correct, one might assume Ms. Benthagen's situation is hopeless; that she never will be able to return to work. But that is not necessarily the case. Several mental health professionals think Ms. Benthagen would profit from therapy and have advised her to participate.

Order ~ 6

Ms. Robinson ("mental health intervention [is] likely to restore or substantially improve [her] ability to work" (TR 279)); Dr. Mabee ("counseling can help her develop better coping and social skills[;] [a]ppropriate medication management can alleviate the severity of her anxiety and depression" (TR 198, 581)); Dr. Arnold (counseling will help "[a]ddress long history of [domestic violence], anxiety, [and] increase [her] ability to function outside her home" (TR 310, 573). Ms. Benthagen has not accepted the advice. The record suggests she met with a counselor on two or three occasions, but since the counselor was a male, she did not relate well to him. Bill Martin, R.N. (April 1, 2010) (Ms. Benthagen "[b]rought in [an] assignment she was asked to do 2 years ago") (TR 266); Belinda Escanio, M.D., (hereinafter Dr. Escanio) (November 15, 2010) (Ms. Benthagen "had seen Bill on 4/10, but wanted to be able to counsel with a woman because of her history of being raped and abused by her ex-husband") (TR 356, 374); Jeff M. Schilt, ARNP ("[Ms. Benthagen] reports counseling has not worked in the past") (TR 673). Obviously, there are many female counselors. Thus, if Ms. Benthagen wanted to participate in counseling, there are options available to her. However, it does not appear she is interested in participating. Dr. Escanio (February 23, 2012) (Ms. Benthagen "is not going to counseling[;] does not feel she needs it at this time" (TR 616)); Dr. Escanio (June 12, 2012)

(same) (TR 619); Dr. Escanio (January 17, 2013) (same) (TR 622); Dr. Islam-Zwart (October 13, 2014) ("She denies any interest in therapy." (TR 647)).

At the administrative hearing on November 19, 2014, Ms. Benthagen testified she has "anxiety and panic attacks." (TR 439.) An anxiety attack can be triggered by something as seemingly inconsequential as a visitor knocking on the front door or a dog barking in the neighbor's yard. (TR 440.) The ALJ did not fully credit Ms. Benthagen's description of her symptoms. Two circumstances figured prominently in his analysis: One was Ms. Benthagen's repeated assertion she does not need counseling. (Several instances are cited above.) Another was her repeated acknowledgement the medication she is taking controls her symptoms of depression. Dr. Escanio (August 4, 2011) ("Citalpram controls depression." (TR 383)); Dr. Escanio (February 23, 2012) ("patient has been stable taking Celexa daily" (TR 616)); Dr. Escanio (June 12, 2010) (same) (TR 616); Dr. Escanio (January 17, 2013) (same) (TR 622); ARNP Schlit (November 13, 2014) ("[Patient] uses donazepam only when she has a flare of anxiety -- uses more socially. Some depression.") (TR 673.)

**ANALYSIS**

Ms. Benthagen

Ms. Benthagen alleges the ALJ failed to provide clear and convincing reasons for discounting her testimony. *Smolen v. Chater*, 80 F.3d 1273, 1283

Order ~ 8

(9th Cir.1996) (absent evidence of malingering, an "ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so"). However, it is undisputed Ms. Benthagen repeated told a treating physician, Dr. Escanio, her depression is under control and she does not need counseling. Ms. Benthagen's statements to Dr. Escanio are consistent with those she made to Dr. Islam-Zwart. Given Ms. Benthagen's lack of interest in counseling, and given the relief that is provided by the medications she is taking, the ALJ had a clear and convincing basis for declining to credit her description of her symptoms.

### B. Psychological Assessments

As explained above, Ms. Benthagen was examined by psychologists on a number of occasions. The ALJ considered their assessments at Step Four in the sequential evaluation process, 20 C.F.R. § 416.920(a)(4), as he determined her Residual Functional Capacity ("RFC"). The latter is, of course, "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a). Since her limitations are a product of severe mental impairments, the opinions of psychologists are potentially very important. That is especially true where, as here, the opinions are based upon actual examinations. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998) (an ALJ's decision to discount the opinion of an

Order ~ 9

examining expert may be upheld only if the ALJ provided "specific and legitimate reasons" that are "supported by substantial evidence in the record").

The first mental-health assessment of Ms. Benthagen occurred on October 23, 2007. The person who completed the assessment, Amy Robinson, recommended therapy. She indicated "mental health intervention [is] likely to substantially improve [Ms. Benthagen's] ability to work for pay in a regular and predictable manner[.]" (TR 279.) Dr. Mabee endorsed Ms. Robinson's recommendation. (TR 285.) Indeed, each time he and Dr. Arnold examined Ms. Benthagen, they recommended therapy. Dr. Mabee (November 5, 2009); Dr. Arnold (October 10, 2010); Dr. Arnold (September 2, 2011); Dr. Mabee (July 31, 2012). However, she never made a serious effort to obtain counseling. Over and over, she told Dr. Escanio, her treating physician, she did not need it. (TR 616, 619, 622.) Nor was Dr. Escanio the only person to whom she made such a comment. She expressed much the same sentiment to Dr. Islam-Zwart on October 13, 2014. (TR 647.) At that point, over seven years had elapsed since Ms. Robinson first recommended counseling. One has to wonder what would have happened had Ms. Benthagen made a good-faith effort to participate in counseling during that seven-year period. While therapy would not have eliminated her psychological problems, it almost certainly would have given her skills that would better enable her to cope with them. Indeed, therapy well may

Order ~ 10

have vindicated Ms. Robinson's prediction that "mental health intervention [is] likely to substantially improve [Ms. Benthagen's] ability to work for pay in a regular and predictable manner[.]" (TR 279.)

Ms. Benthagen wants the benefit of the pessimistic assessments that Drs. Mabee, Arnold, and Islam-Zwart have produced.  However, she consistently has refused to follow their recommendation to participate in counseling.  The ALJ reasonably could have found her decision to reject their recommendation exacerbated the impact of her mental impairments and, thus, the assessments of Drs. Mabee, Arnold, and Islam-Zwart are unduly pessimistic.  That this may be the case is supported by the testimony of consulting psychologists Margaret Moore, Ph.D., and Donna Veraldi, Ph.D.  Both experts think Ms. Benthagen has much more potential than either she or the examining psychologists have indicated.  In view of the testimony of Drs. Moore and Veraldi, and in view of Ms. Benthagen's stubborn refusal to participate in therapy, the ALJ did not err in discounting the assessments of Drs. Mabee, Arnold, and Islam-Zwart.

**RULING**

A reviewing court should not substitute its assessment of the evidence for the ALJ's.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.1999).  To the contrary, a reviewing court must defer to an ALJ's assessment as long as it is supported by substantial evidence.  42 U.S.C. § 405(g).  Here, the ALJ's written opinion

Order ~ 11

indicates he engaged in a careful review of the evidence.  He provided clear and convincing reasons for discounting both Ms. Benthagen's description of her symptoms and the pessimistic assessments of assessments of Drs. Mabee, Arnold, and Islam-Zwart.  Since the ALJ's analysis and conclusions are supported by substantial evidence, the Court will affirm his ruling.

**IT IS HEREBY ORDERED**:

1. The defendant's motion for summary judgment (**ECF No. 16**) is **granted** and the plaintiff's (**ECF No. 14**) is **denied**.

3. The ALJ's decision of March 20, 2015 (**TR 411**) is **affirmed**.

**IT IS SO ORDERED**.  The District Court Executive is directed to file this Order, enter judgment accordingly, furnish copies to counsel, and close the case.

**DATED** this 2nd day of May, 2017.

s/Fred Van Sickle
FRED VAN SICKLE
Senior United States District Judge

Order ~ 12